BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiffs
CRUISER SHIPPING PTE LTD. and
UNIVERSAL NAVIGATION PTE LTD.
355 Lexington Avenue
New York, New York 10017
212-983-8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

CRUISER SHIPPING PTE LTD. and
UNIVERSAL NAVIGATION PTE LTD.,

Plaintiffs,

-against-

SUNDERSONS LTD., MILAN NIGERIA LTD.,
SIMRAN MEHER LTD. and VALECHHA
HOLDINGS LIMITED,

Defendants.

---------------------------------------------------------X

07 CV 4036 (JGK)

**SECOND AMENDED VERIFIED COMPLAINT**

Plaintiffs, CRUISER SHIPPING PTE LTD. ("Cruiser") and UNIVERSAL NAVIGATION PTE LTD. ("Universal," and hereinafter with Cruiser, the "Plaintiffs"), by their attorneys, Brown Gavalas & Fromm LLP, as and for their Verified Complaint against Defendants, SUNDERSONS LTD. ("Sundersons"), MILAN NIGERIA LTD. ("Milan Nigeria"), SIMRAN MEHER LTD. ("Simran Meher") and VALECHHA HOLDINGS LIMITED ("Valechha Holdings") (hereinafter the "Defendants"), allege upon information and belief as follows:

1. This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has jurisdiction under 28 U.S.C. § 1333.

2. At all material times, plaintiff, Cruiser was, and now is, a foreign corporation with

an office and place of business at 3 Shenton Way, 11-04 Shenton House, Singapore, 068805 and was the registered owner of the motor vessel CRUISER ("the Vessel")

3. At all material times, plaintiff, Universal, was and now is a foreign corporation with an office and place of business at 3 Shenton Way, 11-04 Shenton House, Singapore, 068805, and was the disponent owner of the Vessel.

4. Upon information and belief, at all material times, defendant, Sundersons, was and now is a foreign corporation with an office and place of business at 52a Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

5. Upon information and belief, at all material times, defendant, Milan Nigeria, was and now is a foreign corporation with an office and place of business at 243 Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

6. Upon information and belief, at all material times, defendant, Simran Meher was and now is a foreign corporation with an office and place of business at 52A Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

7. Upon information and belief, at all material times, defendant, Valechha Holdings, was and now is a foreign corporation with an office and place of business at 52A Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

8. On or about August 4, 2006, a charter party agreement was entered into by and between plaintiff, Universal, and defendant, Sundersons, whereby Universal agreed to let, and Sundersons, as charterer, agreed to hire the M/V CRUISER for a voyage, under certain terms and conditions, from Kakinada Port, India to Port Harcourt, Nigeria ("Charter Agreement"). On or about August 30, 2006, September 9, 2006 and September 12, 2006, plaintiff Cruiser issued twenty bills of lading, Nos. C1 to 20, with respect to cargo transported aboard the Vessel.

9. At all relevant times, defendant Milan was the receiver and/or consignee of the cargo evidenced by said bills of lading. The said bills of lading incorporated all of the terms of the Charter Agreement, including the arbitration clause therein and are therefore subject to the same arbitration clause.

10. Clause 50 of the Charter Agreement contains a London arbitration clause which provides :

> "Should any dispute arise between Owners and Charterers, the matter in dispute shall be referred to three (3) persons in London, one to be appointed by each of the parties hereto and the third by the two so chosen: their decision or that of any two of them shall be final and for the purpose of enforcing any award, this agreement may be a rule of the court. The Arbitrators shall be commercial men."

11. On October 19, 2006, the Vessel arrived at the first discharge port, Lagos, Nigeria and on November 6, 2006, the Vessel arrived at the second discharge port, Port Harcourt, Nigeria, incurring total discharge port demurrage, payable by Defendants, of $36,755.56.

12. At Port Harcourt, the Defendants claimed damage to the cargo discharged at Port Harcourt and prevented the departure of the Vessel by blocking the necessary clearances. In addition, on December 6, 2006, Defendants caused the judicial arrest of the Vessel in Port Harcourt and, without authority from the Court in Port Harcourt or from the Plaintiffs, placed heavily armed men on board the Vessel, effectively holding the Vessel and crew to ransom.

13. With the Vessel now detained and subject to judicial arrest, Defendants demanded payment of $198,987.60 on grounds of alleged cargo shortage, despite the fact that figures from the master indicated that there was no shortage claim when the quantity of cargo discharged in Port Harcourt was compared to the quantity on the cargo manifest; i.e. the quantity placed on board the Vessel at loading.

14. Plaintiffs made various offers to obtain a release of the Vessel pending adjudication,

on the merits of the alleged cargo claim, including an offer to post a guarantee letter from Plaintiffs' insurer. Such guarantee letters are routinely offered and accepted in international shipping transactions and are considered good and acceptable security for claims.

15. Despite Plaintiffs' repeated and reasonable efforts, Defendants refused to accept security in substitution of the continued detention of the Vessel and demanded resolution of the parties' dispute in Nigeria, in breach of the Defendants' obligation to submit all disputes between the parties to arbitration in London.

16. With the Vessel remaining under arrest and detention by Defendants, and in further breach of the binding London arbitration clause, Defendants refused to release the Vessel in substitution for comparable security and demanded payment of $70,000, to be made into a Swiss bank account, and the written agreement of the Plaintiffs to forgo their claims against Defendants, including claims for demurrage, in return for the release of the Vessel.

17. Plaintiffs' payment of $70,000 to Defendants was made under both economic and physical duress, and was procured due to Defendants' breach of the Charter Agreement in detaining the Vessel in Nigeria and seeking to compel Plaintiffs' to forego their rights under the Charter Agreement and applicable law.

18. Defendants' attempt to pursue their claims against Plaintiffs outside London, and their attempts to compel the Plaintiffs to agree to Nigerian jurisdiction or to pay the alleged claim, constitute a breach of contract, economic duress and oppressive and/or vexatious and/or bad faith conduct because:

a. the Plaintiffs and their insurers have offered to secure Defendants' alleged claims with a Club Guarantee with English law and arbitration; and

b. the sole purpose of the arrest and the Defendants' refusal to negotiate release of

the Vessel against comparable substitute security was intended to compel and coerce Plaintiffs, under extreme economic duress, to agree to Nigerian jurisdiction and law or into paying Defendants' claim by way of settlement.

19. Clause 54 of the Charter Agreement provides as follows:

> "In the event of any alleged cargo claim/shortages Charterers/Receivers are to accept Owners' Pandi Club Letter of Guarantee/bond only. No cash settlement to be allowed whatsoever. Owners Pandi Club is South of England.
>
> If vessel is not released then immediately vessel goes on detention at USD12,000 per day pro rata plus costs of bunkers consumed and any other directly related costs until vessel is released."

A copy of the Charter Agreement is attached hereto as Exhibit "A."

20. Plaintiffs have incurred costs and losses as a result of the detention of the Vessel and the breaches of the Charter Agreement on the part of Defendants, their servants and agents, including load port and discharge port demurrage, detention charges, bunkers consumed during the detention period, daily running expenses and earning losses, in an amount of $311,650.00, as best as can be determined at the present time.

21. On information and belief, the Defendants, including defendant Valechha Holdings, are all affiliated entities operating under the name "Milan Group" and, at all relevant times held, and continue to hold, themselves out to the world as being members of the "Milan Group," an international trading group based in Lagos, Nigeria.

22. On information and belief, all the members of the "Milan Group," including the Defendants herein, share officers, directors and personnel, as well as common offices and addresses in, among other places, Lagos, Nigeria.

23. Upon information and belief, the said members of the Milan Group, including Defendants herein, transact business as the "Milan Group," and not individually, and said

members are jointly and severally liable for the obligation of each other member of the Milan Group, including Sundersons' obligations under the Charter Agreement.

24. Upon information and belief, the said members of the Milan Group, including Defendants herein, are guarantors of the obligations of each individual member of the Milan Group, including Sundersons' obligations under the Charter Agreement.

25. Upon information and belief, defendant Valechha Holdings exercises such complete domination and control over defendants Sundersons, Mila Nigeria and Simran Meher, and/or disregarded Sundersons's, Milan Nigeria's and Simran Meher 's corporate form, and/or conducted the business and operations of Sundersons, Milan Nigeria and Simran Meher as if the same were Valechha Holdings's own, that adherence to the fiction of the separate existence of the Defendants as entities distinct from one another and/or the separate existence of defendants Sundersons, Milan Nigeria and Simran Meher, as distinct from Defendant Valechha Holdings, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

26. Upon information and belief, there exists, and at all times herein mentioned there existed, a unity of interest and ownership between and amongst Defendants, such that any individuality and separateness between said Defendants have ceased, and Defendants, and each of them, are the alter egos of each other.

27. In accordance with a binding arbitration clause in the Charter Agreement and in the bills of lading, Plaintiffs will commence arbitration proceedings in London, England.

28. This action is in aid of said arbitration proceedings, as aforesaid, in accordance with 9 U.S.C. § 8. Plaintiffs seek to obtain adequate security to satisfy a potential London arbitration award in Plaintiffs' favor.

29. Plaintiffs sue on their own behalf, and as agents and trustees on behalf of any other persons or parties who may now have, or hereinafter acquire, an interest in this action.

30. Insofar as legal costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration proceedings, Plaintiffs also seek to secure claims for interest and anticipated legal costs and attorneys fees. As best as can now be estimated, Plaintiffs expect to recover the following amounts in the London arbitration:

| | | |
|---|---|---|
| a. | On the principal claim | $311,650.00 |
| b. | Interest at 6% per annum, compounded quarterly for 3 years | $ 60,964.40 |
| c. | Costs (arbitrators' fees, attorneys' fees, etc.) | $ 45,000.00 |
| | TOTAL | $417,614.40 |

23. Upon information and belief, Defendants cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but are believed to have or will have during the pendency of this action assets within this District, specifically including cash, funds, freight, hire, accounts and other property, in the hands of garnishees in the District including but not limited to American Express Bank, Ltd.; ABN-AMRO Bank; Mashreq Bank; Standard Chartered PLC; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Citibank, Bank of China and Wachovia Bank, which are believed to be due and owing to the Defendants.

WHEREFORE Plaintiffs pray:

A. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Second Amended Verified Complaint;

B. That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules and the United States Arbitration Act, 9 U.S.C §§ 1 and 8, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Mashreq Bank; Standard Chartered PLC; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Citibank, Bank of China and Wachovia Bank, which are due and owing to the Defendants, in the amount of $417,614.40, to secure the Plaintiffs' claim, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged;

C. That this action be stayed and this Court retain jurisdiction over this matter through the entry of any judgment or award, and any appeals thereof; and

D. That Plaintiffs have such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
September 6, 2007

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiffs
CRUISER SHIPPING PTE LTD. and
UNIVERSAL NAVIGATION PTE LTD.

By: ______________________
Peter Skoufalos (PS-0105)
355 Lexington Avenue
New York, New York 10017
212-983-8500

**VERIFICATION**

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

PETER SKOUFALOS, being duly sworn, deposes and says:

1. I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas & Fromm LLP, attorneys for Plaintiffs.

2. I have read the foregoing Second Amended Verified Complaint and I believe the contents thereof are true.

3. The reason this Verification is made by deponent and not by Plaintiffs is that Plaintiffs are foreign corporations, no officer or director of which is within this jurisdiction.

4. The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiffs.

PETER SKOUFALOS

Sworn to before me this
6th day of September, 2007

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 2010

# EXHIBIT A

ORIGINAL

# CONTINENT GRAIN CHARTERPARTY
## Code name: "SYNACOMEX 2000"

Adopted PARIS 1957 by SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES amended 1990, 1974, 1990 and 2000 in agreement with COMITE CENTRAL DES ARMATEURS DE FRANCE in cooperation with Chambre Arbitrale Maritime de Paris and the French Chartering and S. & P. Brokers' Association

PART I

| | |
|---|---|
| 1. Shipbroker(s)<br>Anglomar Shipping Ltd., London | 2. Place and date of Charter Party<br>London 04th AUGUST 2006 |
| 3. Owners and place of business (state full style and address) (Cl. 1)<br>Universal Navigation<br>as Disponent Owners | 4. Charterers and place of business (state full style and address) (Cl. 1)<br>Sundarsons Nigeria, Ltd. |
| 5. Vessel's name (Cl. 1) mv CRUISER<br>flag / built / class: Panama 1982 Hellenic<br>NT / GT: 14,504/8,834<br>summer DWT: See Clause 29 | 6. First layday date (Cl. 6) 12th August 2006<br>Cancelling date (Cl. 6) 22nd August 2006 |
| | 7. Present position / expected ready to load (Cl. 1)<br>trading |
| 8. Loading port(s) (Cl. 2)<br>Kakinada<br>a) Always afloat (*) b) "safely aground" (*) | 9. Advance notices (Cl. 3)<br>- at load port to<br>- at discharging port: number of days / to: ? |
| 10. Discharging port(s) (Cl. 3)<br>1 safe berth Lagos plus 1 sb Port Harcourt<br>a) Always afloat (*) b) "safely aground" (*) | |
| 11. Cargo nature and quantities (Cl. 7)<br>a) No bags (*) b) Maximum in bags for stowage (*) | 12. Freight rate (Cl. 4)<br>USD 60.00 per metric ton free in and out free stowed basis 1 load/ 2 discharge |
| 13. Freight rate payment (state currency and method of payment, beneficiary and bank account) (Cl. 4)<br>See Clause 47 | 14. Loading rate (Cl. 5)<br>2000 metric tons pwwd shex. See also Clause 5<br>15. Discharging rate (Cl. 5)<br>1000 metric tons pwwd shinc. See also Clause 5.<br>16. Demurrage / Despatch money (Cl. 5)<br>USD 5,000 pdpr / hdwtsbe |
| 17. Agents at loading port(s) (Cl. 13)<br>See Clause 52 | 18. Agents at discharging port(s) (Cl. 13)<br>See Clause 52 |
| 19. Extra insurance, maximum (Cl. 14) | 20. Brokerage commission and to whom payable (Cl. 15)<br>1.25% to Anglomar Shipping Ltd. to be deducted from freight<br>a) Deductible (*) b) Non-deductible (*) |
| 21. Address Commission (Cl. 16)<br>3.5% to Charterers to be deducted from freight | |
| 22. Numbers of the additional clauses covering special provisions, if any agreed<br>Additional clauses from clause 29 to clause 66 are deemed to be incorporated to this Charter Party | |

It is mutually agreed that this Charter Party shall be performed subject to the conditions contained herein consisting of PART I and PART II including additional clauses if any agreed and stated in Box 22. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. ... PTE) LTD

| | |
|---|---|
| For the Owners<br>[signature] | For the Charterers |

(*) Delete as appropriate. If no deletion, alternative a) to apply.

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

Approved by The Documentary Committee of The Baltic and International Maritime Council (BIMCO)

Printed by BIMCO's idea

Copyright, published by SYNACOMEX and COMITE CENTRAL DES ARMATEURS DE FRANCE

ORIGINAL

PART II

"SYNACOMEX 2000" Continent Grain Charterparty

1. Owners, Charterers

It is this day agreed between the party designated in Box 3, Owners of the Vessel named and described in Box 5, being now in position and expected ready to load as mentioned in Box 7, and the party designated in Box 4 as Charterers, THAT

2. Loading Port(s) and Cargo

The said Vessel being tight, staunch and in every way fit for the voyage, shall with all convenient speed proceed to the place designated in ~~Box 8~~, which in case of named port(s), 1 safe berth / safe anchorage Kakinada

Owners acknowledge as safe and suitable for this Vessel and there load always afloat, ~~unless "safely aground" has been specifically agreed in Box 8~~, in such safe berth, dock, wharf or anchorage as Charterers or their Agents or Shippers may direct, a ~~full and complete cargo~~ 23,000/24,750 metric tons ~~45,000 metric tons~~ min/maximum of bagged Rice. Exact quantity as per actual stowage factor which Charterers advise but no not guarantee as 51'. To be declared seven days prior arrival at load port of vessel

~~[illegible struck-through text]~~

The cargo shall not exceed what the Vessel can reasonably stow and carry over and above her bunkers, apparel, stores, provisions and accommodation. The whole cargo shall be carried and stowed under deck in unobstructed main holds. All cargo on board to be delivered.

~~[illegible struck-through text]~~ The number of bags signed for on Bills of Lading to be binding on Vessel and Owners, unless error or fraud be proved.

3. Discharging Port(s)

Being so loaded, the Vessel shall proceed with all convenient speed direct to the ~~place designated in Box 10~~, 1 safe berth Lagos including Tincan island plus 1 safe berth Port harcourt in Charterers' option. Charterers advise that min draft in Lagos 9.5 meters salt water which in case of named port(s) Owners acknowledge as safe and suitable for this Vessel, and there discharge the cargo always afloat, ~~unless "safely aground" has been specifically~~ agreed in Box 10, in such safe berth, dock, wharf or anchorage as Charterers or their Agents or Receivers may direct. ~~Receivers have the option of using a second safe berth. The time for shifting between the two berths shall count as laytime, but shifting expenses shall be for Vessel's account.~~

4. Freight

The freight agreed under this Charter Party shall be as stated in Box 13, per metric ton on net Bill of Lading weight and shall be deemed earned as cargo is loaded on board, prepaid discountless and non-returnable, Vessel and/or cargo lost or not lost

The freight shall be paid as per Clause 47. ~~as specified in Box 13.~~ ~~[illegible struck-through text]~~

5. Loading and Discharging

Cargo shall be loaded, spout-trimmed and/or stowed at the ~~risk and~~ expense of Shippers/Charterers at the average rate stated in Box 14 -1500/2000/1000 metric tons per weather working day basis vessel's gear as described Sundays and Holidays excluded. See also Clause 8 ~~weather permitting~~.

Cargo shall be discharged at the risk and expense of Receivers/Charterers at the average rate stated in Box 15, 1000 metric tons per weather working day basis vessel's gear as described Saturdays, Sundays and Holidays excluded. See also Clause 8.

~~weather permitting~~.

Stowage shall be under Master's direction and responsibility. Shippers' and/or Charterers' representatives have the right to be on board the Vessel during loading, discharging or lightering for the purpose of inspecting the cargo and/or weighing. Charterers and Owners are allowed to work overtime, such expenses shall be for account of the party ordering same. If ordered by Port Authorities, overtime shall be for Charterers' account. Overtime services rendered by ship's crew shall be in all cases for Owners' account.

6. Laydays, Cancelling

At port of loading laytime shall not count before 00.00 hours on the layday date stated in Box 6 ~~and in any case not before the date notified by the 10 days notice as per Clause 7~~

Should the Vessel's notice of readiness not be validly tendered as per Clause 8 before 00.00 hours on the cancelling date stated in Box 6, Charterers shall have the Option of cancelling this charter at any time thereafter, but not later than one hour after the notice is validly tendered.

7. Vessel's Positions, Notices

Master and/or Owners shall give 10 days and thereafter 5/4/3/2/1 days and 12 hours notice of Vessel's expected readiness to load to the party designated in Box 5

Master and/or Owners shall give 7/5/4/3/2/1 days notice of Vessel's Expected Time of Arrival (ETA) at discharging port ~~as specified in Box 8~~ (to be advised)

Master and/or Owners shall give the relevant parties prompt Advice of any substantial change in Vessel's ETA at loading and at discharging ports

8. Laytime

Vessel's written notice of readiness to load and/or discharge shall be tendered by hand or by any means of telecommunication at the offices of Shippers/Charterers/Receivers or their Agents, Monday through Friday, between 08.30 and 17.00 hours ~~on all days except Saturdays, Sundays and Holidays and between 08.00 hours and 12.00 hours on Saturdays unless a Holiday~~ Saturday 12.00 hours to Monday 0800 hrs EIU clause to apply both ends

. Such notice of readiness shall be delivered when Vessel is in the loading or discharging berth and in all respects ready to load/discharge. At both ends if the berth is congested/ unreachable Master has the right to tender N.O.R from the anchorage even by cable/telex/fax/email and time to count whether in berth or not, whether in port or not, whether free pratique or not, whether customs cleared or not. At loading port Shippers/

Charterers or their Agents have the privilege to inspect Vessel's holds. If it requested by Charterers, a survey may be carried out at their time and risk to establish vessel's holds and hatch covers suitability to load bagged rice and Owners to have the right to be represented during such survey by their P&I Surveyors. ~~and reject the notice when holds are not clean, dry, odourless and in all respects ready to receive the cargo.~~

In case of disagreement between the two surveyors then an independent surveyor (mutually agreed between Charterers' and the Owners P&I surveyor) to be appointed whose findings to be binding for both parties. In case any deficiency, then same to be promptly made good by the Owners and any time lost from the time of rejection till the time of acceptance not to count as laytime.

~~In case of dispute, an independent surveyor shall decide about Vessel's readiness to load, the party in the wrong bearing the costs.~~ If the rejection of notice of readiness is undisputed or confirmed by surveyor the laytime will only start to count after the Vessel has validly tendered again

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

ORIGINAL

## PART II
## "SYNACOMEX 2000" Continent Grain Charterparty

when ready.

Only when the loading and/or discharging berth is unavailable, or Shippers or Receivers not ready to load/ discharge Master may warrant that the Vessel is in all respects ready and may tender notice of readiness to load and/or discharge from any usual waiting place, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not.

Laytime shall commence at ~~14.00~~ 13.00hours if notice of readiness to load and/or discharge is validly tendered at or before 12.00 hours and at 08.00 hours on the next working day if notice of readiness is validly tendered after 12.00 hours. Time used before commencement of laytime shall not count. At loading port Laytime shall not count between 12.00 hours on Saturdays or ~~17~~ 12.00 hours on days preceding a Holiday and 08.00 hours on Monday or the following working day, even if used.

At discharging port(s) laytime shall not count between 17.00 hours on Friday or 17.00 hours on the day preceding Holiday and 08.00 hours on Monday or the following working day, even if used.

~~unless used in which case half time actually used shall count.~~

~~Any delays caused by ice, floods, quarantine or by cases of "force majeure" shall not count as laytime unless the~~

Any delays caused by ice, floods, quarantine, or cases of "force majeure" shall not count as laytime unless Vessel is already on demurrage. Once on demurrage always on demurrage but Charter Party exceptions always to apply ie gear breakdown/ crew and/ or officers strike, failure to pay any disbursement accounts for Owners' account etc.

When Master has tendered notice of readiness to load or discharge from a waiting place and Vessel is subsequently found unready in application of the above provisions, laytime or time on demurrage shall not count from the time the Vessel is rejected until the time she is accepted. Additionally, any actual time lost on account of Vessel's obtaining free pratique or customs clearance shall not count as laytime or time on demurrage.

At second or subsequent port(s) of ~~loading or discharging~~, laytime or time on demurrage shall resume counting from Vessel's arrival at ~~loading or discharging~~ berth, if available, or from Vessel's arrival at a usual waiting place, if berth is unavailable.

At all ports any time lost shifting from waiting place to berth shall not count as laytime or as time on demurrage.

**9. Demurrage, Despatch Money**

Demurrage is payable by Charterers at the rate stated in Box 15 USD 6,000 per day pro rata half despatch laytime saved both ends per day of 24 consecutive hours or pro rata.

~~Owners shall pay to Charterers despatch money for laytime saved in loading/discharging at the rate stated in Box 16 per day of 24 consecutive hours or pro rata.~~

**10. Seaworthy Trim**

If ordered to be loaded or discharged at more than one berth and/or port, the Vessel is to be left in seaworthy trim to Master's reasonable satisfaction for the passage between berths and/or ports at Shippers'/Charterers'/Receivers' expense, and time used for placing Vessel in seaworthy trim shall count as laytime or time on demurrage.

**11. Fumigation See Clause 37**

~~Charterers have the liberty to fumigate the cargo on board at loading and discharging port(s) or places on Charterers' time and expense. Charterers are responsible for ensuring that Officers and Crew as well as all other persons on board the Vessel during and after the fumigation are not exposed to any health hazard whatsoever. Charterers undertake to pay Owners all necessary expenses incurred because of the fumigation and time lost thereby shall count as laytime or time on demurrage. When fumigation has been effected at loading port and has been certified by proper survey or by a competent authority, Bills of Lading shall not be claused by Master for reason of insects having been detected in the cargo prior to such fumigation.~~

**12. Lights and Gear**

Whenever required, Vessel shall supply free use of lights as on board but sufficient to carry on night work.

Provided described as geared, Vessel, whenever required, shall supply free use of all cargo handling gear on board, in good working order, with the necessary power, and of runners, ropes and slings as on board. Shore hands shall be used to drive the gear, at Shippers'/Charterers'/ Receivers' account. Any time actually lost on account of breakdown of Vessel's gear shall not count as laytime or time on demurrage and any stevedore standby time charges incurred thereby shall be for Owners' account. The Gear's / Crane's breakdown than laytime not to count but always on prorata basis.

**13. Agencies**

~~At loading port, Vessel shall be consigned to the Agents designated in Box 17.~~ See Clause 62

~~At discharging port, Vessel shall be consigned to the Agents designated in Box 18.~~ See Clause 62

**14. Extra Insurance**

Any Extra Insurance on cargo due to Vessel's age and/or flag and/or class and/or ownership shall be for Charterers' account ~~Owners' account but limited to the amount specified in Box 19. Such extra insurance shall be covered by Charterers for Owners' account and shall be deducted from settlement of freight.~~

**15. Brokerage**

A brokerage commission as stated in Box 20 on the gross amount of freight, deadfreight and demurrage earned, is due to the party(ies) designated in Box 20 and is deductible from same unless "non-deductible" has been specifically agreed.

**16. Address Commission**

An address commission as stated in Box 21 on the gross amount of freight, deadfreight and demurrage earned is due to Charterers and is deductible from freight, deadfreight and demurrage.

**17. ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

**18. Bills of Lading**

The Master is to sign Bills of Lading as presented without prejudice to the terms, conditions and exceptions of this Charter Party. If the Master delegates the signing of Bills of Lading to his Agents, but always to be in a strict conformity with Mate's Receipts he shall give them authority to do so in writing, copy of which is to be furnished to Charterers.

When Bills of Lading marked "Freight prepaid" are required, See clause 47.

~~Same shall be released by Owners immediately upon receipt~~

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

3

ORIGINAL

## PART II
## "SYNACOMEX 2000" Continent Grain Charterparty

~~of a telex from Charterers' Bank confirming that freight payable has been irrevocably transferred.~~

**19. Relet**
~~Charterers have the right to relet all or part of this Charter Party, they remaining responsible for the due fulfillment~~

**20. Deviation**
Deviation in saving or attempting to save life or property at sea or for bunkering purposes or any other reasonable deviation shall not be deemed an infringement of this Charter Party and the Owners shall not be liable for any loss or damage resulting therefrom.

**21. Lien Clause**
The Owners shall have a lien on the cargo for freight, deadfreight, demurrage, and average contribution due to them under this Charter Party.

**22. Responsibilities and Immunities**
Except as otherwise provided and stipulated in this Charter Party, it is hereby expressly agreed that this Charter Party shall have effect subject to the provisions of the Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924, as enacted in the country of shipment. These rules shall apply to any Bill of Lading issued under this Charter Party.
When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd, 1968 - The Hague - Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply.
The Owners shall in no case be responsible for loss of or damage to cargo howsoever arising prior to loading into and after discharge from the Vessel.
Save to the extent otherwise in this Charter Party expressly provided, neither party shall be responsible for any loss or damage or delay or failure in ~~performance hereunder~~ resulting from Act of God, war, civil commotion, quarantine, strikes, lockouts, arrest or restraint of princes, rulers and peoples or any other event whatsoever which cannot be avoided or guarded against.

**23. Amended General Ice Clause**
Port of Loading
a) In the event of the loading port being inaccessible by reason of ice when Vessel is ready to proceed from her last port or at any time during the voyage or on Vessel's arrival or in case frost sets in after Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.
b) If during the loading the Master, for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owner's benefit to any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per Charter Party.
c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section b) or to declare this Charter Party null and void unless Charterers agree to load full cargo at the open port.
Port of Discharge
a) Should ice prevent Vessel from reaching port of discharge, Receivers shall have the option of keeping Vessel waiting until the reopening of navigation and paying demurrage, or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Master or Owners have given notice to Charterers of the impossibility of reaching port of destination.
b) If during discharging the Master for fear of Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.
c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**24. Amended Centrocon Strike Clause**
If the cargo cannot be loaded by reason of Riots, Civil Commotions or of a Strike or Lock-out of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages beyond the control of the Charterers caused by Riots, Civil Commotions or a Strike or Lock-out on the Railways, or in the Docks, or other loading Places, or if the cargo cannot be discharged by reason of Riots, Civil Commotions or of a Strike or Lock-out of any class of workmen essential to the discharge, the time for Loading or discharging, as the case may be, shall not count during the continuance of such causes, provided that a Strike or Lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable labour at rates current before the Strike or Lock-out.
In case of any delay by reason of the before-mentioned Causes, no claim for damages or demurrage, shall be made by the Charterers / Receivers of the cargo, or Owners of the Vessel. For the purpose, however, of settling despatch Money accounts, any time lost by the Vessel through any of the above causes shall be counted as time used in loading or discharging, as the case may be.

**25. General Average and New Jason Clause**
General average shall be adjusted according to the York-Antwerp Rules 1994 or any subsequent modification thereof, but where the adjustment is made in accordance with the law and practice of the United States of America, the following Clause shall apply:
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving Ship or ships belonged to strangers. Such deposit as the

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

ORIGINAL

PART II

**"SYNACOMEX 2000" Continent Grain Charterparty**

carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

26. Both-to-Blame Collision Clause

If the liability for any collision in which the Vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

27. War risks ("Voywar 1993")

a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Charter Party, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Charter Party, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, provided always that if this Charter Party provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Charter Party if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Charter Party. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

e) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTÉRIEUR DES CÉRÉALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

5

04-APR-2007 17:49 FROM JACKSON PARTON TO 0012129835946 P.27/83
FROM : FAX NO. : 65 63244450 Dec. 05 2006 04:27PM P6

ORIGINAL!

PART II
"SYNACOMEX 2000" Continent Grain Charterparty

the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(iv) a discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.
(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.
f) If in compliance with any of the provisions of sub-clauses b) to e) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Charter Party.

28. Arbitration See clause 49
~~Any dispute arising out of the present contract shall be referred to Arbitration of "Chambre Arbitrale Maritime de Paris – 16 rue Daunou – 75002 Paris".~~
~~The decision rendered according to the rules of Chambre Arbitrale and according to French Law shall be final and binding upon both parties. The right of both parties to refer any disputes to arbitration ceases twelve months after date of completion of discharge or, in case of non-execution or non-performance, twelve months after the cancelling date as per Clause 5 or after the actual date of cancellation whichever is the later. Where the provision is not complied with, the claim shall be deemed to be waived and absolutely barred.~~

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.